UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ROYAL SUMMERS,

    *Plaintiff,*

    v.

ERIN DUNAHAY, ELIZABETH TEGELS, CASEY JENSEN,
JEREMIAH CURTIS, KRISTINE SMETANA, JAMES NYHUS,
NICHOLAS KLIMPKE, & BLAKE WEIKEL,

    *Defendants.*

Case No. 3:25-cv-324

## COMPLAINT

Plaintiff Royal Summers, by his attorneys, Strang Bradley, LLC, for his complaint against Defendants, states:

### INTRODUCTION

1. In February of 2023, Plaintiff Summers, an inmate at Jackson Correctional Institution, learned that a gang had ordered its members at the institution to kill him.

2. Summers warned the Defendants on numerous occasions that his life was at risk. Summers repeatedly pled with the Defendants to protect him from these gang members.

3. The Defendants knew the threats against Summers were credible; on February 19, 2023, a member of the gang attempted to kill Summers by slitting his neck with a razor.

4. These threats to Summers's life intensified after chargers were filed against the member of the gang who had slit his throat.

5. Despite knowing the threats to Summers's life were credible and that there was a strong likelihood that Summers would be seriously harmed by future assaults, the Defendants did not take any action to protect Summers.

6. Instead of taking active measures to protect Summers, Defendant Dunahay first ignored Summers's pleas for help.

7. After the physical assaults against Summers continued, Captain Dunahay told Summers that he should "lay low in his cell."

8. When Summers continued to be attacked on her watch, Defendant Dunahay resorted to blaming Summers for the attacks on his life. She responded to Summers's continued pleas for help by telling him to "take responsibility" for being assaulted.

9. And despite knowing the attacks were retaliation for Summers's cooperation with the Jackson County District Attorney's Office, she falsely insinuated that the assaults against him were justified because they were "related to drug debts."

10. As a result of the Defendants' inaction, Summers was physically assaulted by members of the gang on five separate occasions between February 2023 and February 2024.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over federal questions under 28 U.S.C. § 1331.

12. Venue is proper under 28 U.S.C. § 1391(b)(2) because the events or omissions giving rise to the claims asserted herein occurred within this judicial district.

## PARTIES

13. Plaintiff Royal Summers is an adult resident of the State of Wisconsin.

14. Defendant Erin Dunahay was, at the time of this occurrence, employed as the administrative captain at the Jackson Correctional Institution.

15. At all times relevant to this action, Defendant Dunahay engaged in the conduct complained of while she was a correctional supervisor and was acting under color of state law.

16. At all times relevant to this action, Defendant Dunahay was acting within the scope of her employment with the State of Wisconsin.

17. Defendant Dunahay is sued in her individual capacity.

18. Defendant Elizabeth Tegels was, at the time of this occurrence, employed as the Jackson Correctional Institution Warden.

19. At all times relevant to this action, Defendant Tegels engaged in the conduct complained of while she was the warden and was acting under color of state law.

20. At all times relevant to this action, Defendant Tegels was acting within the scope of her employment with the State of Wisconsin.

21. Defendant Tegels is sued in her individual capacity.

22. Defendant Casey Jensen was, at the time of this occurrence, employed as the security director of the Jackson Correctional Institution.

23. At all times relevant to this action, Defendant Jensen engaged in the conduct complained of while he was the security director and was acting under color of law.

24. At all times relevant to this action, Defendant Jensen was acting within the scope of his employment with the State of Wisconsin.

25. Defendant Jensen is sued in his individual capacity.

26. Defendant Jeremiah Curtis was, at the time of this occurrence, employed as a captain with the Jackson Correctional Institution.

27. At all times relevant to this action, Defendant Curtis engaged in the conduct complained of while he was a correctional supervisor and was acting under color of law.

28. At all times relevant to this action Defendant Curtis was acting within the scope of his employment with the State of Wisconsin.

29. Defendant Curtis is sued in his individual capacity.

30. Defendant Kristine Smetana was, at the time of this occurrence, employed as the Corrections Program Supervisor at the Jackson Correctional Institution.

31. At all times relevant to this action, Defendant Smetana engaged in the conduct complained of while she was a correctional supervisor and was acting under color of law.

32. At all times relevant to this action Defendant Smetana was acting within the scope of her employment with the State of Wisconsin.

33. Defendant Smetana is sued in her individual capacity.

34. Defendant James Nyhus was, at the time of this occurrence, employed as a correctional sergeant with the Jackson Correctional Institution.

35. At all times relevant to this action, Defendant Nyhus engaged in the conduct complained of while he was a correctional sergeant and was acting under color of law.

36. At all times relevant to this action Defendant Nyhus was acting within the scope of his employment with the State of Wisconsin.

37. Defendant Nyhus is sued in his individual capacity.

38. Defendant Nicholas Klimpke was, at the time of this occurrence, employed as a correctional sergeant with the Jackson Correctional Institution.

39. At all times relevant to this action, Defendant Klimpke engaged in the conduct complained of while he was a correctional sergeant and was acting under color of law.

40. At all times relevant to this action Defendant Klimpke was acting within the scope of his employment with the State of Wisconsin.

41. Defendant Klimpke is sued in his individual capacity.

42. Defendant Blake Weikel was, at the time of this occurrence, employed as a correctional officer with the Jackson Correctional Institution.

43. At all times relevant to this action, Defendant Weikel engaged in the conduct complained of while he was a correctional officer and was acting under color of law.

44. At all times relevant to this action Defendant Weikel was acting within the scope of his employment with the State of Wisconsin.

45. Defendant Weikel is sued in his individual capacity.

## FACTS

46. In February of 2023, Plaintiff Summers was an inmate at Jackson Correctional Institution (JCI) in Black River Falls, Wisconsin.

47. Unbeknownst to Summers, a gang wrongly concluded that Summers had been involved in the disappearance of one of their gang members.

48. Summers was not involved in the disappearance.

49. Based on this false belief, the gang "green-lighted" attacks on Summers in prison. This means that the gang informed their members inside of JCI that they should attack and attempt to kill Summers.

50. During this time, Summers was in the Melrose Housing Unit of JCI.

51. Two members of the gang were also being housed in Melrose.

52. On February 18, 2023, the two gang members "jumped" Summers and physically beat him using their fists.

53. The following day on February 19, Summers was sitting on a chair in Melrose Unit.

54. One of the two gang members approached Summers from behind and wrapped one of his arms around Summers's head and neck.

55. With his other arm, the gang member sliced Summers's neck and face using a razor.

56. The gang member proceeded to knee Summers while he was bleeding out on the ground.

57. Eventually, Defendant Nyhus walked in on the assault and observed Summers attempting to block the gang member's punches.

58. Nyhus drafted an incident report later that day.

59. As a result of observing this incident, Nyhus had personal knowledge that members of the gang were attempting to kill Summers.

60. After witnessing the assault, Nyhus debriefed Defendants Smetana and Klimpke on his observations.

61. As a result of this conversation, Smetana and Klimpke had personal knowledge that members of the gang had attempted to kill Summers.

62. Later that day, Smetana and Klimpke interviewed Summers about the assault.

63. Summers informed Smetana and Klimpke that the two gang members were attempting to kill him due to a gang-related dispute.

64. Summers also told Smetana and Klimpke that the gang members had jumped him the previous day.

65. Following her interview with Summers, Smetana found the security footage of the February 18 assault. This footage corroborated Summers's account.

66. Smetana and Klimpke debriefed Nyhus on their interview with Summers. At this point, these three Defendants were aware that that Summers had been physically assaulted by the gang members on two occasions.

67. These three Defendants also knew that there was an ongoing threat to Summers's safety.

68. After speaking with Smetana and Klimpke, Nyhus completed his incident report.

69. On March 9, 2023, Defendant Captain Erin Dunahay reviewed and approved Nyhus's incident report.

70. At this point, Captain Dunahay had personal knowledge that Summers had been physically assaulted by the two gang members on two occasions in the past week. Captain Dunahay also had personal knowledge that one of the gang members had attempted to kill Summers.

71. On March 15, 2023, JCI placed Summers in 30 days of disciplinary separation as punishment for his verbal exchange with one of the gang members following the February 19 assault.

72. While in the Restricted Housing Unit (RHU), other inmates informed Summers that members of the gang, including the same two as before, had discussed plans to harm Summers once he returned to the general population.

73. Summers was told which inmates were threatening to hurt him. Summers knew the first two gang members by their legal names. But Summers only knew the other inmates threatening him by their street names.

74. On March 20, 2023, Summers submitted a request for an interview with Defendant Casey Jensen, the JCI Security Director. Summers stated in his request to Jensen:

> I'm having an issue with some people saying they want to kill me. I wrote Capt. Dunahay about this issue. It's all about what happened with conduct report number 00307592. I'm writing to you because I just don't want to be hurt or assaulted anymore, and I don't want any more problems.

75. Jensen received and reviewed Summer's request two days later.

76. After reviewing Summers's request, Jensen had personal knowledge that inmates were threatening to harm Summers once he returned to the general population.

77. Based on his personal knowledge of the two prior assaults against Summers, Jensen also knew there was strong likelihood that Summers would be seriously harmed as a result of a future assault.

78. Jensen chose not to meet with Summers. Instead, he responded in writing, "Please speak to Capt. Curtis related to this issue."

79. On March 20, Summers also submitted a request for an interview with Captain Dunahay, stating:

> I need to talk to you as soon as I can. It's about 00307592 conduct report. There are people saying that they will deal with me when I get back to [general population] and I need to talk to you about this issue. Please and thank you I just don't want any more problems with these people.

80. Captain Dunahay reviewed Summers's request. At this point, Dunahay had personal knowledge that inmates were threatening to harm Summers once he returned to the general population.

81. Based on her personal knowledge of the two prior assaults against Summers, Dunahay also knew there was strong likelihood that Summers would be seriously harmed as a result of a future assault.

9

82. Captain Dunahay then forwarded the request onto Defendant Captain Jeremiah Curtis for action.

83. On March 21, Captain Curtis reviewed Summers's request. At this point, Curtis had personal knowledge that inmates were threatening to harm Summers once he returned to the general population.

84. Based on the conduct report Summers referenced in his request, Captain Curtis also knew that inmates had already attempted to harm and kill Summers.

85. Given his personal knowledge of the prior assaults against Summers, Captain Curtis also knew there was strong likelihood that Summers would be seriously harmed as a result of a future assault.

86. Curtis did not grant Summers's request for an interview; rather, he provided Summers with "request for separation" forms.

87. Separation forms allow an inmate to request that the institution physically separate them from another inmate in prison.

88. Summers responded in writing later that day, requesting an interview with JCI staff. Summers wrote:

> I received some inmate separation forms, but I only know people by their last names and their street names. How can I get these people's first names? I need to talk to someone. Please, I would like to not be talked to at my cell please.

89. Captain Dunahay received and reviewed the correspondence the following day, March 22.

90. Captain Dunahay did not talk to Summers as he had requested.

91. Instead, Captain Dunahay wrote back and instructed Summers to list the prisoners' last and street names. She indicated that she would try to figure out who they were based on that information.

92. Later that day, Summers submitted five inmate separation forms.

93. On two of these forms, Summers explained that he was making this request because the two gang members had physically assaulted him on two separate occasions in February.

94. On the three remaining inmate separation forms, Summers identified the inmates using their street names because he did not know their legal names.

95. Summers explained that he had received threats from these inmates for because of their gang affiliation.

96. Captain Dunahay received these five inmate separation forms on or about March 23, 2023. But Captain Dunahay did not process these requests upon receiving Summers's forms.

97. Summers was released from the restricted housing unit into general population on April 7, 2023.

98. Despite Summers's repeated requests for interviews and assistance while in segregated housing, Security Director Jensen, Captain Dunahay, and Captain Curtis all chose not to meet with Summers or address his concerns before he was released back into the general population.

99. Hours after being released back into general population, Summers was physically assaulted by a third gang member.

100. Defendant CO Blake Weikel witnessed the gang member physically assault Summers.

101. Weikel interviewed Summers about the physical assault.

102. Summers explained to CO Weikel that the members of a gang were attempting to harm and kill him inside of JCI.

103. CO Weikel completed a report on April 9. The report was then routed up to Security Director Jensen.

104. Jensen reviewed and approved CO Weikel's report on April 11.

105. At this point, Jensen had personal knowledge that members of the gang had physically assaulted Summers three times in under two months.

106. Jensen also had personal knowledge that the gang had given the "green light" for their members to kill Summers.

107. Following Jensen's review and approval, the report was routed to Captain Curtis.

108. Captain Curtis reviewed CO Weikel's report on April 12.

109. At this point, Captain Curtis had personal knowledge that members of the gang had physically assaulted Summers three times in under two months.

110. Captain Curtis also had personal knowledge that the gang had given the "green light" for their members to kill Summers.

111. After Captain Dunahay learned that Summers was physically assaulted on April 7, she started to process his inmate separation request forms.

112. On April 9, Captain Dunahay denied three of Summers's requests for separation, saying one did not meet the criteria and the other two she could not identify by street name.

113. Captain Dunahay either failed to review or failed to document her review of Summers's remaining two requests for separation.

114. Summers submitted an inmate complaint (ICE) alleging JCI's failure to protect him from a known threat.

115. Summers's complaint was reviewed and investigated.

116. On May 9, Summers submitted a second ICE complaint requesting that JCI take additional steps to prevent him from being harmed by other inmates.

117. On May 10, Summers's ICE complaint was rejected.

118. Summers appealed this ICE rejection on May 31, 2023.

119. Summers's appeal was reviewed by Defendant Warden Elizabeth Tegels.

120. As part of this review, Warden Tegels read Summers's allegations that inmates in Melrose Unit were trying to kill him and that he needed additional protection.

121. Warden Tegels also reviewed the incident reports that were submitted as part of Summers's appeal. These incident reports corroborated that Summers had been physically assaulted on three occasions since February.

122. As the Warden of JCI, it was Tegels's responsibility to provide for the safety and wellbeing of every prisoner at the institution.

123. Following her review of Summers's appeal and his supporting documentation, Warden Tegels had personal knowledge that Summers was still being targeted for physical assaults by other inmates within JCI.

124. Following this review, Warden Tegels also had personal knowledge that JCI was not protecting Summers from inmates who wanted to harm him.

125. Following this review, Warden Tegels knew there was a strong likelihood that Summers would be seriously harmed by a future assault.

126. Despite having this personal knowledge, Warden Tegels did not personally act to protect Summers.

127. She also failed to instruct her staff to implement policies or practices to protect Summers from this serious threat to his safety.

128. Instead, Warden Tegels denied Summers's appeal as untimely.

129. In October 2023, one of the gang members was criminally charged by the Jackson County District Attorney for assaulting Summers.

130. As the prosecution proceeded, the gang learned of it and intensified their threats towards Summers.

131. Prior to January of 2024, Summers spoke to Captain Dunahay and informed her that he was being threatened with physical harm in retaliation for the prosecution.

132. Captain Dunahay acknowledged that she understood that Summers was facing the threat of retaliatory violence.

133. Summers requested that he be transferred to a new institution to help ensure his safety.

134. Dunahay agreed that she would attempt to transfer him to a new correctional institution.

135. But despite being aware of the credible threats to Summers's safety, Captain Dunahay did not take any immediate action to protect Summers.

136. Instead, Captain Dunahay instructed Summers to "lay low" and to "stay in his cell."

137. Following this conversation, Captain Dunahay decided that she would not transfer Summers to another prison while the criminal case was still pending.

138. Captain Dunahay could have transferred Summers to another prison during this time.

139. After deciding not to transfer Summers to a new prison, Captain Dunahay did not take any measures to protect Summers.

140. On January 26, 2024, Summers was physically assaulted by members of the gang.

141. On February 5, 2024, Summers submitted a request for information to Captain Dunahay, stating:

> On 1/26/2024, I was assaulted again. I did not fight back but I can't keep letting people put there hands on me. We talked about this before can you please help me with this issue?

142. The following day, Captain Dunahay responded:

> I have placed you on the list to transfer to another medium. We do need to wait until this trial has been resolved. I've been working on

>this since we last spoke. Stay in your room and away from others as best as you can.

143. Despite having personal knowledge that gang members had physically assaulted Summers in retaliation for the prosecution, Captain Dunahay did not take any measures to protect Summers.

144. Dunahay instead forced Summers to fend for himself against a known, serious threat to his safety.

145. Three days later, on February 9, another member of the gang physically assaulted Summers.

146. On February 10, Summers submitted a request for information to Captain Dunahay, telling her that he was attacked.

147. Captain Dunahay responded on February 12 by blaming Summers for getting attacked again. Dunahay wrote, "Very disappointed. I told you to lay low—in your cell!"

148. On February 15, Summers replied to Captain Dunahay:

>I've been asking for help since March 2023. When I first got cut. Then the fight in April. You said I was out of here. Then what happened to me being on the board to transfer back in April of 2023? People keep assaulting me and now it's my fault? I give up. Whatever happens now it will be better than being a sitting duck here at JCI.

149. Later that day, Captain Dunahay responded. She implied that Summers deserved his assaults because they were related to a drug deal. Dunahay wrote:

>Yes—some of what you state is accurate. But some incidents you failed to respond appropriately. Some say you were assaulted due to drug deals. I'm not sure if that's accurate…

150. On February 22, Captain Dunahay wrote to Summers. Captain Dunahay again tried to blame Summers for the numerous assaults he had endured, telling him:

> Take responsibility for your actions. Word also is, allegedly, the recent fight you were involved in was about a debt.

151. Summers was then placed in restrictive housing.

152. Prisoners in the Wisconsin prison system are not allowed to defend themselves from attack.

153. Due to Summers fighting back after being attacked, he was disciplined numerous times.

154. Because of the repeated disciplines, Summers was moved to a maximum security institution.

155. Because Summers was moved to a maximum institution, Summers lost his chance to participate in the Earned Release Program.

156. Summers filed an ICE about the February 9 attack.

157. The complaint was dismissed because Summers had been moved to RHU and was going to be transferred to another institution.

158. This lawsuit is brought to hold Captain Dunahay and the other Defendants responsible for repeatedly failing to protect Royal Summers from a serious threat.

159. As a direct and proximate result of the acts of Captain Dunahay and the other Defendants, as detailed above, Plaintiff suffered, *inter alia*, body injury, pain, suffering, mental anguish, humiliation, and loss of reputation.

## COUNT I:
### 42 U.S.C. § 1983 Claims for Eight Amendment:
### Failure to Protect on April 7, 2023, Against Defendants
### Dunahay, Jensen, Curtis, Smetana, Klimpke, and Nyhus

160.　　Plaintiff realleges the above paragraphs.

161.　　There was a strong likelihood that Plaintiff Summers would be seriously harmed as the result of an assault.

162.　　Defendants Dunahay, Jensen, Curtis, Smetana, Klimpke and Nyhus actually knew or were actually aware of facts from which it would be obvious of this strong likelihood that Plaintiff Summers would be seriously harmed as the result of an assault, or strongly suspected facts showing a strong likelihood that Plaintiff would be seriously harmed but refused to confirm whether these facts were true.

163.　　Defendants Dunahay, Jensen, Curtis, Smetana, Klimpke, and Nyhus consciously failed to take reasonable measures to prevent the assault.

164.　　Plaintiff Summers would not have been harmed or would have suffered less harm if Defendants Dunahay, Jensen, Curtis, Smetana, Klimpke, and Nyhus had acted reasonably.

165.　　The above-described actions of Defendants Dunahay, Jensen, Curtis, Smetana, Klimpke, and Nyhus were the direct and proximate cause of the constitutional violations set forth above and of Plaintiff's injuries and damages set forth above.

WHEREFORE, pursuant to 42 U.S.C. § 1983, Plaintiff demands actual or compensatory damages against Dunahay, Jensen, Curtis, Smetana, Klimpke, and Nyhus; and because they acted maliciously, wantonly, or oppressively, punitive

damages; the costs of this action, attorneys' fees; and such other and further relief that the Court deems just and equitable.

## COUNT II:
### 42 U.S.C. § 1983 Claims for Eight Amendment: Failure to Protect on February 9, 2024, Against Defendants Dunahay, Jensen, Curtis, Smetana, Klimpke, Tegels, Weikel, and Nyhus

166. Plaintiff realleges the above paragraphs.

167. There was a strong likelihood that Plaintiff Summers would be seriously harmed as the result of an assault.

168. Defendants Dunahay, Jensen, Curtis, Smetana, Klimpke, Tegels, Weikel, and Nyhus actually knew or were actually aware of facts from which it would be obvious of this strong likelihood that Plaintiff Summers would be seriously harmed as the result of an assault or strongly suspected facts showing a strong likelihood that Plaintiff would be seriously harmed but refused to confirm whether these facts were true.

169. Defendants Dunahay, Jensen, Curtis, Smetana, Klimpke, Tegels, Weikel, and Nyhus consciously failed to take reasonable measures to prevent the assault.

170. Plaintiff Summers would not have been harmed or would have suffered less harm if Defendants Dunahay, Jensen, Curtis, Smetana, Klimpke, Tegels, Weikel, and Nyhus had acted reasonably.

171. The above-described actions of Defendants Dunahay, Jensen, Curtis, Smetana, Klimpke, Tegels, Weikel, and Nyhus were the direct and proximate cause of

the constitutional violations set forth above and of Plaintiff's injuries and damages set forth above.

WHEREFORE, pursuant to 42 U.S.C. § 1983, Plaintiff demands actual or compensatory damages against Dunahay, Jensen, Curtis, Smetana, Klimpke, Tegels, Weikel, and Nyhus; and because they acted maliciously, wantonly, or oppressively, punitive damages; the costs of this action, attorneys' fees; and such other and further relief that the Court deems just and equitable.

## JURY DEMAND

Plaintiff hereby demands a trial by jury, pursuant to FED. R. CIV. PRO. 38(b), on all issues so triable.

Respectfully submitted,

Dated: 25 April 2025,

/s/ R. Rick Resch
John H. Bradley
  Wisconsin Bar No. 1053124
R. Rick Resch
  Wisconsin Bar No. 1117722
William E. Grau
  Wisconsin Bar No. 1117724
STRANG BRADLEY, LLC
613 Williamson Street, Suite 204
Madison, Wisconsin 53703
(608) 535-1550
John@StrangBradley.com
Rick@StrangBradley.com
William@StrangBradley.com